## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| LENA V. AWAN and MUHAMMAD S. AWAN,<br><br>      Plaintiffs,<br><br>v.<br><br>DAVID DOUGLAS, District Director, District 32, U.S. Citizenship and Immigration Services; KIN MA, Field Officer Director, Salt Lake City Field Office, U.S. Citizenship and Immigration Services; UR JADDOU, Director, U.S. Citizenship and Immigration Services; ALEJANDRO MAYORKAS, Secretary, Department of Homeland Security; and BOARD OF IMMIGRATION APPEALS,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [34] PLAINTIFFS' MOTION FOR REVIEW OF AGENCY ACTION**<br><br>Case No. 2:21-cv-00163<br><br>District Judge David Barlow<br><br>Magistrate Judge Daphne Oberg |

Plaintiffs bring this action under 5 U.S.C. § 706(2)(a) seeking review of a final agency action after the Board of Immigration Appeals (BIA) denied an I-130 Petition filed on behalf of Muhammad.[1] Having considered the briefing, the record, and the relevant law, the court concludes Plaintiffs' Motion for Review of Agency Action (Motion) may be resolved without oral argument.[2] For the reasons discussed below, the court grants in part and denies in part the motion.

---

[1] *See generally*, Complaint, ECF No. 2. There are multiple parties with the same last name or who have changed their names. To prevent confusion, the court departs from its general practice and refers to the parties by their first names.

[2] *See* DUCivR 7-1(g).

## BACKGROUND

Muhammad and Lena met when they both lived in Ukraine in 2000 while studying at the same university.[3] Muhammad came to the United States on a student visa on August 20, 2001 to study in Wichita, Kansas.[4] On January 17, 2002, a few months after arriving in the United States, Muhammad married a different woman, Leanne, in Kansas.[5] Leanne and Muhammad did not have an apartment in which to live together until at least March 2002.[6] By September 2002, both Muhammad and Leanne were listed on the lease agreement.[7]

On July 9, 2002, Leanne filed the first Form I-130 visa petition for Muhammad.[8] USCIS interviewed both Leanne and Muhammad on January 13, 2003.[9] The record does not contain notes regarding this interview. In later affidavits, Muhammad and Leanne have claimed they had marital problems in the summer of 2003 when she went to New York and allegedly had an affair with an old acquaintance.[10] After Leanne returned, she told Muhammad about the affair, and he went to Ukraine to see his son.[11] Muhammad and Lena have stated this is when their romantic relationship began.[12] Muhammad returned to Ukraine in January 2004 to visit Lena.[13]

On February 24, 2004, Lena came to the U.S. on a student visa to study at Wichita State University, the same as Muhammad.[14] On September 28, 2004 in Kansas, Lena had her first

---

[3] R132, 141.
[4] *See* R138.
[5] R479.
[6] *See* R415.
[7] R417.
[8] *See* R138.
[9] *See id.*
[10] R141, 151.
[11] R151.
[12] R132, 141.
[13] R141, 152, 634.
[14] *See* R132.

daughter with Muhammad.[15] On April 18, 2006, Lena and Muhammad had a second daughter together.[16]

In February 2007, Muhammad and Leanne were interviewed again by USCIS.[17] In an April 2011 declaration, Leanne stated that it was at this 2007 interview that she found out from "Immigration" about Muhammad's relationship with Lena and their two children.[18] Similarly, in an April 2011 declaration, Muhammad stated that Leanne was told about Lena and their two daughters during the February 2007 interview with USCIS.[19]

Between 2007 and July 2008, Muhammad moved to Kansas City for work.[20] Leanne testified that she and Muhammad were also romantically separated during this time.[21] In contrast, Muhammad testified he and Leanne were never romantically separated and that Leanne came to visit him.[22] While Muhammad and Leanne lived apart, on May 19, 2007, Leanne married Tony Case while still married to Muhammad.[23] Muhammad states that he did not learn about the marriage to Tony until two years later.[24]

In 2007 Muhammad had also co-signed a mortgage and purchased a home with Lena.[25] On July 18, 2008, Lena and Muhammad had a third daughter together.[26] On or about March 26, 2009, USCIS came to Muhammad's home in Andover, Kansas and found Lena at the home with

---

[15] R132, 138.
[16] R138.
[17] *Id.*
[18] R443.
[19] R446.
[20] *See* R143, 149, 444.
[21] Leanne Interview at 7:35–8:53.
[22] Muhammad Interview at 30:17–30:36.
[23] R462.
[24] R139, 627–28.
[25] *See* R134, 144.
[26] R139.

their three daughters.[27] Leanne was allegedly at work but returned to the home after Muhammad

called her, and she then spoke to the USCIS officers.[28] They questioned her about her marriage

to Tony Case.[29] Muhammad asserts that it was at this time that he first learned of Leanne's

marriage to Tony.[30]

In September 2010, USCIS again interviewed Muhammad and Leanne.[31] On September

16, 2010, Leanne divorced Tony Case, or rather the marriage was annulled as she was still

legally married to Muhammad.[32] On October 12, 2010, USCIS again interviewed Leanne and

Muhammad.[33]

On March 21, 2011, USCIS denied the first petition filed in 2002.[34] On April 20, 2011,

Leanne filed a second visa petition for Muhammad.[35] Leanne and Muhammad were interviewed

separately on October 11, 2011.[36] The administrative record contains video recordings of these

interviews. During the interview, Leanne could not spell Muhammad's middle name[37] and did

not immediately remember the name of one of Muhammad's daughters.[38] In Muhammad's

interview, he indicated that Leanne found out about the girls "about a year" after they were born

(in 2004, 2006, and 2008) by talking with his sister.[39] However, during her interview on that

---

[27] *Id.*

[28] R139, 627.

[29] *Id.*

[30] R139, 627–28.

[31] *See* R140.

[32] *See* R140, 160–63.

[33] *See* R140.

[34] *See id.*

[35] *See id.*

[36] *See* R405–08.

[37] Leanne Interview at 3:05–3:50.

[38] *Id.* at 4:57–5:53. Leanne apologized and indicated she had anesthesia the day before. The interviewer asked if she was able to proceed with the interview, and Leanne responded yes. *Id.* at 5:57–6:01. Leanne stated two of the girls' names and could not remember the name of the third daughter. However, a few minutes later, she remembered the third girl's name. *Id.* at 6:33–6:36.

[39] Muhammad Interview at 37:33–37:49.

4

same day, Leanne told USCIS that she found out about each child a few days before each was born.[40]

During the October 2011 interview, Muhammad also claimed that he did not marry Lena because he did not love her and just wanted to make Leanne jealous.[41] He also repeated multiple times that he loved Leanne, that she was his wife, that he "could not think of the hardships" she would have if he was not there with her, and that he does whatever he can to make her life comfortable.[42] Leanne stated in her October 2011 interview that she loved Muhammad very much and that "he's going to be the one that stands by [her] side while [she] goes through whatever [she's] going through now."[43] She also agreed that it was their intent to stay married and living together as husband and wife.[44]

A little over a month later, on November 30, 2011, Leanne and Muhammad were divorced in Kansas.[45] A few weeks after that, on January 16, 2012, Lena and Muhammad married in Salt Lake City.[46] On May 29, 2013, USCIS denied the second petition filed in 2011 by Leanne.[47]

On August, 29, 2013, Lena naturalized as a U.S. citizen.[48] On August 26, 2016, Lena filed a third petition for Muhammad.[49] On January 30, 2018, USCIS interviewed Lena and Muhammed.[50] On March 28, 2019, USCIS issued a Notice of Intent to Deny (NOID) the third

---

[40] Leanne Interview at 12:22–12:45.
[41] Muhammad Interview at 19:34–19:44.
[42] *Id.* at 59:00–1:00:30.
[43] Leanne Interview at 30:28–30:40.
[44] *Id.* at 36:32–36:46.
[45] R222–25.
[46] *See* R141, 220.
[47] *See* R141.
[48] *See id.*
[49] *See id.*
[50] *See id.*

visa petition.[51] The basis was that there was "substantial and probative evidence" that Muhammad's previous marriage to Leanne was for the purpose of evading immigration laws.[52] The NOID listed a "Timeline of Key Events" as the "substantial and probative evidence contained within the record demonstrating that [Muhammad's] first marriage to [Leanne] was entered into for fraudulent purposes to avoid immigration laws."[53] It also listed "Contradictions of Claimed Marriage and Inconsistent Testimony."[54]

On or about April 24, 2019, Lena and Muhammad submitted a Brief in Support of Petitioner's Response to the Notice of Intent to Deny Approval of Visa Petition.[55] They provided responses and evidence to rebut the eleven "contradictions" noted in the NOID.

On August 27, 2019, the Director denied the visa petition.[56] The Decision similarly concluded that "the substantial and probative evidence contained within the record demonstrate[d] that your spouse's first marriage to [Leanne] was entered into for fraudulent purposes to avoid immigration laws" and listed the timeline of key events and inconsistent testimony.[57] The Director then listed eight bullet points responding directly to the Plaintiffs' proffered evidence rebutting the claims of fraud.

Plaintiffs appealed the Director's decision to the BIA.[58] On December 1, 2020, the BIA reviewed the Director's decision *de novo* and affirmed the Director's decision denying the visa petition.[59] It determined "the record contains substantial and probative evidence of prior

---

[51] R77–81, 173–77.
[52] R173–77.
[53] R174–75.
[54] R176–77.
[55] R82–117.
[56] R60–67.
[57] R62–67.
[58] R16–20, 25–48.
[59] R2–3.

marriage fraud on [Muhammad's] part."[60] The BIA pointed to evidence in the record that Muhammad fathered "three children and purchased a home" with Lena while married to Leanne.[61] Leanne married another man during her marriage to Muhammad.[62] Leanne was unable to spell Muhammad's middle name and did not know the names of his three children with Lena.[63] The BIA was "not persuaded" by evidence of a post-interview psychological evaluation regarding Leanne and her "deficient performance" at the 2011 interview.[64] The BIA determined Leanne's declaration attesting to the bona fide nature of her marriage with Muhammad was "self-serving" and entitled to "limited weight."[65] In short, there was insufficient evidence of a "joint life between" Muhammad and Leanne.[66] The BIA also concluded there was no due process violation because the Director "properly analyzed all of the relevant documentary evidence submitted by [Lena], including the evidence submitted in response to the NOID."[67]

Plaintiffs now appeal the BIA's decision.

## STANDARD

Plaintiffs seek relief under the Administrative Procedure Act (APA). Pursuant to the APA, the court is to set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[68] When reviewing a challenge to an agency action under the APA, the "district court acts as an appellate court" and "employs summary judgment to decide, as a matter of law, whether the agency action is

---

[60] R2.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] R3.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] 5 U.S.C. § 706(2)(A); *see also New Mexico Farm & Livestock Bureau v. United States Dep't of Interior*, 952 F.3d 1216, 1231 (10th Cir. 2020).

supported by the administrative record and otherwise consistent with the APA standard of review."[69] The court's review is "limited to the administrative record, including 'all materials compiled by the agency that were before the agency at the time the decision was made.'"[70] The APA requires that the agency "give adequate reasons for its decision."[71] The arbitrary and capricious standard "is very deferential to the agency."[72]

"An agency's action is entitled to a presumption of validity, and the burden is upon the petitioner to establish the action is arbitrary or capricious."[73] An agency's decision is arbitrary and capricious if the agency:

> (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error in judgment.[74]

If the decision is not supported by "substantial evidence in the record, [the court] must set it aside as arbitrary and capricious."[75] Substantial evidence requires that "the agency's record must contain enough facts supporting the decision that a 'reasonable mind' could accept it as 'adequate to support [the] conclusion."[76] Evidence is inadequate "if it is overwhelmed by other evidence or constitutes a mere conclusion."[77]

---

[69] *New Mexico Health Connections v. United States Dep't of Health & Human Servs.*, 946 F.3d 1138, 1161 (10th Cir. 2019) (cleaned up and citation omitted).

[70] *Id.* at 1161–62 (citation omitted).

[71] *Id.* at 1162 (citation omitted).

[72] *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020).

[73] *Sorenson Commc'ns, Inc. v. F.C.C.*, 567 F.3d 1215, 1221 (10th Cir. 2009).

[74] *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 839 (10th Cir. 2019) (citation omitted).

[75] *Blanca Telephone Company v. Fed. Commc'ns Comm'n*, 991 F.3d 1097, 1120 (10th Cir. 2021).

[76] *Id.* (alteration in original) (citation omitted).

[77] *Id.*

## ANALYSIS

Plaintiffs make four main arguments in their motion. First, Plaintiffs argue the Director violated USCIS's procedure by allegedly including new derogatory information in the Decision, thereby preventing Plaintiffs from rebutting the evidence and violating Lena's due process rights. Second, Plaintiffs argue the BIA erred in affirming the denial instead of remanding to the Director to correct the procedural error and allow Plaintiffs an opportunity to respond to the allegedly new derogatory information in the Decision. Third, Plaintiffs contend the BIA erred by not applying recent case law in its decision. Lastly, Plaintiffs argue the BIA's decision was arbitrary and capricious.

## I.   STATUTORY AND REGULATORY FRAMEWORK

At issue is the BIA's review of a Form I-130 Petition that would allow Muhammad to be classified as the spouse of a U.S. citizen under Section 201(b) of the Immigration and Nationality Act (INA). There are prohibitions on when such a petition can be granted. Specifically, 8 U.S.C. § 1154(c) provides that

> [N]o petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

This is known as the fraudulent marriage prohibition. This prohibition applies to any prior marriage even if the subsequent marriage is bona fide.[78]

The statute does not establish how a determination is made that the marriage was entered into for the purpose of evading immigration laws. However, there are relevant regulations that

---

[78] *See Matter of Otiende*, 26 I. & N. Dec. 127 (BIA June 4, 2013).

explain this process.[79] 8 C.F.R. § 204.2(a)(1)(ii) prohibits "the approval of a visa petition filed on behalf of an alien who has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." The section also contains mandatory language that a director "*will deny* a petition for immigrant visa classification filed on behalf of any alien for whom there is *substantial and probative evidence* of such an attempt or conspiracy, regardless of whether that alien received a benefit through the attempt or conspiracy."[80]

This regulation regarding "substantial and probative evidence" has been the standard for many years.[81] The initial burden of proof is on the government to determine if there is substantial and probative evidence of marriage fraud.[82] If the government intends to deny the petition based on "derogatory information considered by [USCIS] and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered."[83] The burden then shifts to the petitioner to rebut the government's finding.[84]

## II.     NEITHER THE DIRECTOR NOR THE BIA COMMITTED ANY PROCEDURAL ERRORS.

Plaintiffs argue that the BIA erred when it did not remand the Decision to the Director for failure to follow proper procedure. As just noted, 8 CFR § 103.2(b)(16)(i) provides that if a director is going to issue an adverse decision based on derogatory information of which the petitioner is unaware, the petitioner must have notice and be given the opportunity to present rebuttal evidence. Here, the Director issued the NOID and noted the proper standards and burden

---

[79] *See Matter of P. Singh*, 27 I. & N. Dec. 598, 602 (BIA Aug. 23, 2019).
[80] 8 C.F.R. § 204.2(a)(1)(ii) (emphases added).
[81] *Singh*, 27 I. & N. Dec. at 603; *see also Pitman v. United States Citizenship & Immigration Servs.*, 485 F. Supp. 3d 1349, 1354 (D. Utah 2020).
[82] *See Singh*, 27 I. & N. at 605; *Pitman*, 485 F. Supp. at 1354.
[83] 8 C.F.R. § 103.2(b)(16)(i).
[84] *Singh*, 27 I. & N. at 605; *Pitman*, 485 F. Supp. at 1354.

shifting. First, she indicated that there must be "substantial and probative evidence of such an attempt or conspiracy and the derogatory evidence must be contained in the alien's file."[85] After detailing that standard, the Director then correctly noted that "[w]here there is 'substantial and probative evidence' of prior marriage fraud in the record, the burden then shifts to the petitioner to overcome this evidence. Hence, the petitioner must present evidence to show that the prior marriage was not entered into for the primary purpose of evading immigration law."[86]

The NOID established a timeline and summary of relevant events contained in the record as substantial and probative evidence of fraud.[87] The Director then listed eleven "Contradictions of Claimed Marriage and Inconsistent Testimony."[88] After listing these things, the Director wrote that based on the record evidence, "USCIS finds that there is substantive [sic] and probative evidence that Muhammad AHMAD and Leanne COSENTINO never established a bona fide marriage with one another but rather engaged in [a] fraudulent marriage scheme in order to obtain an immigration benefit."[89] After making an explicit finding of substantial and probative evidence, the Director indicated that the Plaintiffs had thirty days to respond and were allowed to "submit any documentation that you believe establishes the validity of your husband's claimed prior marriage to his USC spouse."[90]

Plaintiffs responded, providing affidavits and other information in response to those eleven alleged contradictions; in fact, they addressed them point by point.[91] The Director then

---

[85] R78.

[86] *Id.*

[87] R78–80.

[88] R80–81.

[89] R81. It seems clear that the use of "substantive" here is a typo as the Director stated the correct "substantial and probative" standard many other times in the NOID. Furthermore, Plaintiffs have not argued that the Director applied the wrong standard based on this typo.

[90] R81.

[91] R101–108, 118–71. Most of this evidence was affidavit testimony, but the Plaintiffs did attach various documents including birth certificates, passports, drivers' licenses, school awards, school transcripts, and a list of other

issued the Denial.[92] The Denial mirrored the NOID in the standard, timeline of events, and

eleven alleged contradictions.[93] The Denial then noted that the Plaintiffs had responded to the

NOID and submitted evidence to rebut the findings.[94] The Director listed eight bullet points of

evidence submitted in the Plaintiffs' response to the NOID.[95] These bullet points detailed the

evidence submitted and responded with why the Director concluded that evidence was

insufficient to overcome the evidence of fraud as detailed in the NOID.[96] On appeal, the BIA

found no error in the Director's process and determined there were "no grounds upon which to

conclude that the petitioner was prejudiced or that she suffered any due process violation such

that remanded proceedings would be warranted."[97]

     In the Motion, Plaintiffs argue that the eight bullet points are new derogatory information

raised for the first time in the Decision to which they did not have an opportunity to respond.[98]

They argue this violated the agency's procedure and violated their rights. The court must

determine whether the bullet points in the Decision are new derogatory information of which the

Plaintiffs were unaware such that they were entitled to present rebuttal evidence.

     The relevant portion of the Decision begins with the Director stating that Plaintiffs

responded to the NOID and "submitted the following documentation."[99] The Director then

responded to the evidence submitted in bullet points.[100] Each of the bullet points included an

---

documents submitted with the previously denied second visa petition (affidavits from Leanne and Muhammad, letters from friends and family attesting to the marriage, post-interview psychological evaluation of Leanne, tax returns, phone records, bank statements, and lease agreements).

[92] R60–67.
[93] R60–64.
[94] R64–66.
[95] R64–66.
[96] R64–66.
[97] R3.
[98] Motion at 18–20.
[99] R64.
[100] R64–66.

evaluation of the evidence presented and explained why the Director either did not credit the evidence or why the evidence was unhelpful in showing the marriage between Muhammad and Leanne was not for the purpose of evading immigration laws. Some of these responses faulted Plaintiffs for not producing documents, some of which do not seem obviously relevant to the overall issue, such as documentation of the down payment and mortgage documents for the home purchased with Lena[101] or estate documents from Leanne's mother.[102] However, none of the points addressed by the Director refer to new "derogatory information" about which the Plaintiffs were unaware.[103]

For example, the first bullet point noted that the Director did not credit statements made by Lena about events outside of her personal knowledge.[104] Next, the Director noted she did not credit testimony regarding the "open marriage."[105] Third, the Director evaluated Muhammad's statement about why he bought the house with Lena and noted why she did not find that statement convincing.[106] Fourth, the Director discussed Leanne's psychological evaluation and why she did not give it much weight or find it persuasive.[107] Fifth, the Director discussed why she did not find testimony about Leanne's motives for marrying Tony Case persuasive.[108] Sixth, the Director again evaluated Muhammad's testimony about why he bought the home with Lena and the lack of supporting documentation.[109] Seventh, the Director evaluated an affidavit from Leanne about why she and Muhammad got married and discussed inconsistencies.[110] Lastly, the

---

[101] R64–65.
[102] R65.
[103] *See* 8 C.F.R. § 103.2(b)(16)(i).
[104] R64.
[105] *Id.*
[106] *Id.*
[107] R65.
[108] *Id.*
[109] *Id.*
[110] R65–66.

Director compared Muhammad's two marriage ceremonies and concluded there was lack of credible evidence showing Leanne and Muhammad had a shared life together.[111]

The Director does not cite to any new document or information that was not already addressed by the NOID or introduced by the Plaintiffs. She responded to the evidence Plaintiffs presented, evaluated that evidence, and made observations and conclusions. Plaintiffs' argument asks for a never-ending cycle of responding to any statement made by the Director in a NOID or Decision. That is not the procedure established in evaluating a petition. The NOID presented the basis for the Director's denial. Plaintiffs responded to the NOID with evidence they hoped would rebut those conclusions. The Director evaluated that evidence and did not find it persuasive. Because the Director did not refer to any new derogatory information about which the Plaintiffs were unaware in the Decision, there were no procedural violations.

Plaintiffs rely on *Pitman*[112] as support that the Director misapplied the standard and violated their rights. The case is inapposite. In *Pitman*, a couple similarly sought review of the BIA's decision to deny an I-130 petition.[113] The main issue in *Pitman* was the director "never 'found' substantial and probative evidence of marriage fraud in the Notice of Intent to Deny."[114] In the NOID, the *Pitman* director relied on an improper standard, so the burden never shifted to the petitioner, as was required.[115] The director was under "the mistaken belief that Mr. Pitman bore the burden, under a clear and convincing standard of proof, to show" that the beneficiary's previous marriage was entered into in good faith and not for the purpose of evading immigration

---

[111] R66.

[112] *Pitman v. United States Citizenship & Immigration Servs.*, 485 F. Supp. 1349 (D. Utah 2020); *see also* Motion at 18–20.

[113] *Pitman*, 485 F. Supp. 3d at 1352.

[114] *Id.* at 1354–55.

[115] *Id.* at 1355.

law.[116] Since there were no findings of substantial and probative evidence of marriage fraud in the NOID, "the burden never shifted to Mr. Pitman."[117] Since burden shifting is necessary before a petition can be denied, the court determined the BIA's decision affirming the Director's denial failed to follow its own regulations and therefore was arbitrary and capricious.[118]

Here, as detailed above, the Director made an explicit finding that substantial and probative evidence showed that the Muhammad-Leanne marriage was a sham.[119] The same concerns that existed in *Pitman* are not present here. The Director engaged in the appropriate burden-shifting analysis. And as the court has already determined, the Director did not present any new derogatory information of which Plaintiffs were unaware in the Denial. Therefore, *Pitman* does not advance Plaintiffs' argument or demand a different result than what the BIA concluded.

Throughout their reply, Plaintiffs also repeatedly refer to "secret evidence" relied on in the Defendants' opposition.[120] Plaintiffs refer to eight separate citations from the record that are allegedly "secret evidence."[121] Yet, Plaintiffs did not object to the certification of the record in this case and, as they state numerous times, there is no indication that the BIA considered any of that supposed "secret" evidence as the basis for its decision.[122] Instead, Plaintiffs argue that they

---

[116] *Id.* at 1354.

[117] *Id.* at 1357.

[118] *Id.*

[119] R66 ("However, there is substantial and probative evidence that Mr. Ahmad entered into the marriage with Ms. Cosentino to evade immigration laws.").

[120] *See, e.g.*, Plaintiffs' Reply at 1–8, 22–23, filed January 7, 2022, ECF No. 39.

[121] *See* Reply at 1 (citing R70–73, 179–84, 619–20, 625–28, 633–34, 635–40, 692, 711).

[122] *See* Reply at 2–3, 6 ("As stated, it is unclear if the Board was even privy to the classified documents, as it never referenced them.").

were not "privy" to certain information cited by Defendants in the record[123] and that the

Defendants improperly relied on the information in opposing the Motion.[124]

The inquiry for the court is to review the record to see if there is sufficient support for the

BIA's decision and analysis. The court will not rely on allegations or additional factual

statements made by any party that are unsupported by the record or that the agency did not rely

on in making its decision.[125] As Plaintiffs do not discuss how the alleged "secret evidence" was

the basis of the BIA's decision (indeed, they state that "the Board did not once reference the

'secret evidence,'"[126]) the court need not further address Plaintiffs' statements on this point.[127]

Because Plaintiffs have not shown any procedural errors by the Director or the BIA, there

is no support for the alleged due process violation. The Director did not err in responding to

Plaintiffs' assertions and evidence in the Decision, and the BIA did not err in not remanding to

the Director on any procedural issue.

### III.   THE BIA DID NOT ERR IN ITS APPLICATION OF THE CASE LAW.

Plaintiffs also argue that the Director and BIA erred by not applying *Pitman*[128] and

misapplying *Singh*[129] in their decisions. Four days before the Director issued the decision

---

[123] Reply at 6.

[124] Reply at 1.

[125] *See New Mexico Health Connections*, 946 F.3d at 1161–62 ("Our review is limited to the administrative record, including 'all materials compiled by the agency that were before the agency at the time the decision was made.'" (citation omitted)); *see also Hays Med. Ctr.*, 956 F.3d at 1263 ("To assess the agency's action, we look to 'the agency's contemporaneous explanation in light of the existing administrative record.' But we do not consider the agency's 'post hoc rationalizations' for the action." (citations omitted)).

[126] Reply at 1.

[127] *See e.g.*, Reply at 3 ("In other words, Plaintiffs are unconvinced the actual agency being reviewed by this court-the BIA- was also privy to the 'extensive record' that Defendants now 'cite' and relied on as *substantive* evidence of PM's involvement in marriage fraud when Plaintiffs were not provided the 'classified' or redacted documents."). The court granted Defendants leave to file a surreply addressing Plaintiffs' arguments regarding "secret" and classified documents. *See* Order dated January 16, 2022, ECF No. 44. Plaintiffs filed a response, without leave of the court, making additional arguments about the alleged "secret" evidence.

[128] *Pitman v. United States Citizenship & Immigration Servs.*, 485 F. Supp. 1349 (D. Utah 2020).

[129] *Matter of P. Singh*, 27 I. & N. Dec. 598 (BIA 2019); *see also* Motion at 31.

denying the petition, the BIA issued the *Singh* opinion clarifying the relevant burden and standards of proof.[130] During the time the "substantial and probative evidence" standard was being used, the BIA noted that it had "not published any precedent decision that specifically addresses the type and extent of evidence necessary to meet that standard or that applies *Matter of Tawfik*'s 'reasonable inference prohibition.'"[131] The BIA stated that "[a]lthough the courts have acknowledged that a finding of marriage fraud must be supported by substantial and probative evidence, they have defined that standard by reference to cases that applied the substantial evidence standard of judicial review."[132] Because of some inconsistencies, the BIA sought to clarify that the "substantial and probative evidence" language "refers to the standard of proof required to establish marriage fraud, not to the standard of review."[133] In essence, the BIA wanted to make clear that the government's burden of "substantial and probative evidence" is a different standard than an appellate review looking for "substantial evidence" supporting an agency's decision.

To that end, the BIA clarified that the substantial and probative evidence standard "refers to the quality and quantity of competent, credible, and objective evidence."[134] The BIA then concluded that "the degree of proof required for a finding of marriage fraud sufficient to support the denial of a visa petition under section 204(c) of the Act should be higher than a preponderance of the evidence and close to clear and convincing evidence."[135] So the BIA

---

[130] *Compare Singh*, 27 I. & N. Dec. 598 (issued August 23, 2019) *with* Director's Decision at R60 (dated August 27, 2019).

[131] *Singh*, 27 I. & N. Dec. at 603.

[132] *Id.* at 604 (quotation marks and citations omitted).

[133] *Id.* at 606.

[134] *Id.* (citing *Matter of Tawfik*, 20 I. & N. Dec. 166 (BIA 1990)).

[135] *Id.* at 607.

concluded that "to be 'substantial and probative,' the evidence must establish that it is more than probably true that the marriage is fraudulent."[136]

Plaintiffs argue this constituted a "material change in law" in how the USCIS had been applying the standard.[137] This is not supported by *Singh*'s own language. The BIA made it plain that "[i]n clarifying the degree of proof required under section 204(c), we note that *this is consistent with the standard we currently employ* in adjudicating visa petitions involving marriage fraud."[138] So *Singh* did not create a new standard but instead clarified the standard that had been employed for almost twenty years and how it was different from the "substantial evidence standard."

Understandably, the Director did not reference the *Singh* opinion in the Decision.[139] However, she relied on the correct "substantial and probative evidence" standard and discussed the appropriate burden shifting framework.[140] There is no indication that the Director applied anything other than the appropriate substantial and probative evidence standard. There was no error in the Director's application of the standard, so the BIA did not err in not remanding the decision on those grounds.

Furthermore, the BIA explicitly referenced *Singh* and the standard in that opinion.[141] The BIA cited and relied on *Singh* for the proposition that "the degree of proof necessary to constitute substantial and probative evidence is more than a preponderance of evidence, but less than clear and convincing evidence."[142] The BIA referenced its relevant decisions and applied the

---

[136] *Id.*
[137] Motion at 38.
[138] *Singh*, 27 I. & N. Dec. at 607 (emphasis added).
[139] *See generally* R60–67.
[140] *See* R60–67.
[141] R2–3.
[142] R2.

appropriate standard when analyzing the record evidence before it. The BIA did not err in its application of *Singh*.

Plaintiffs also argue that the BIA erred by failing to apply the *Pitman* decision. Magistrate Judge Oberg already determined Plaintiffs could not supplement the record regarding the *Pitman* decision and that there was insufficient evidence that the BIA received or relied on the *Pitman* decision.[143] Additionally, as the court noted earlier, *Pitman* is factually inapposite to Plaintiffs' case and does not support their argument. Plaintiffs' arguments on this point need not be addressed further.[144]

## IV.   THERE IS INSUFFICIENT INFORMATION TO DETERMINE IF THE BIA'S DECISION WAS ARBITRARY AND CAPRICIOUS.

Lastly, Plaintiffs argue that the BIA's decision was not supported by substantial evidence in the record.[145] The court reviews the BIA's decision under the arbitrary and capricious standard, which "requires an agency's actions to be supported by facts in the record."[146] Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[147]

The relevant inquiry for the court is whether there is sufficient evidence to support BIA's finding that the marriage in question was a sham—entered into primarily[148] for the purposes of

---

[143] Order dated January 24, 2022, ECF No. 41.

[144] *See, e.g.*, Motion at 41–46.

[145] Motion at 46–58.

[146] *Colorado Wild, Heartwood v. United States Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).

[147] *Blanca Telephone Company*, 991 F.3d at 1120.

[148] Plaintiffs argue that the test is whether the marriage was entered into "solely" for the purpose of evading immigration laws. Motion at 46. This is not the correct standard. *See Singh*, 27 I. & N. Dec. at 601 ("A fraudulent or sham marriage is one that, despite its validity under the formal requirements of the law, was 'entered into for the *primary purpose* of circumventing the immigration laws.'" (citation omitted)).

evading immigration laws[149]—at the time it occurred. Relevant evidence can come from before, at the time of, or after the marriage in question took place. The BIA has specifically directed that an examination of the conduct of the parties "before and after the marriage" is necessary "to ascertain their intent" at the time of the marriage.[150] There is no legal or logical prohibition against the USCIS and BIA considering all of the evidence before it, so long as that evidence may shed light on whether the marriage in question was fraudulent at the time it occurred, including whether the parties intended to share a marital life together.

The BIA cited three examples from the record as substantial and probative evidence of prior marriage fraud: (1) Muhammad fathered three children and purchased a home with Lena while married to Leanne; (2) Leanne married another man while married to Muhammad; and (3) Leanne was unable to spell Muhammad's middle name and did not know the names of his children.[151] The BIA also rejected evidence submitted by Plaintiffs regarding Muhammad and Leanne's alleged "open" marriage.[152] The BIA further concluded that Lena and Muhammad's "long-term relationship" predated Muhammad's marriage to Leanne.[153] The BIA was not persuaded by Leanne's after-the-fact psychological evaluation as an explanation of her deficient performance at the USCIS interviews.[154] It also gave "limited weight" to Leanne's "self-serving" declaration attesting to the bona fide nature of her marriage to Muhammad.[155] Relying on these things, the BIA determined that "the record contains substantial and probative evidence" that

---

[149] *See* 8 U.S.C. § 1154(c) (stating that no petition shall be approved if the alien previously sought immediate relative status by reason of a marriage determined to "have been entered into for the purpose of evading the immigration laws").
[150] *Singh*, 27 I. & N. at 601.
[151] R2–3.
[152] R2.
[153] *Id.*
[154] R3.
[155] *Id.*

Muhammad's marriage to Leanne "was entered into for the purpose of evading the immigration laws."[156] Therefore, it denied the petition.

The court agrees with many of the BIA's conclusions as supported by the evidence in the record. First, it is undisputed that Muhammad had three children with Lena while he was married to Leanne.[157] This is a "significant consideration."[158] Even though the first child was born two years into the marriage, post-marriage evidence can help determine if the marriage was entered into with good faith.[159]

As to the BIA's next reason, it is undisputed that Muhammad purchased a home with Lena while married to Leanne.[160] There is no evidence that Muhammad ever purchased a home with Leanne. The record shows that Leanne and Muhammad either leased an apartment, lived with family members, and even lived apart.[161] Buying a home with the mother of his children while married to Leanne reasonably weighs against a finding that Muhammad's marriage to Leanne was bona fide.

Next, it is undisputed that Leanne married Tony Case while still married to Muhammad.[162] This supports the BIA's denial of the petition because marrying another person while still married could reasonably be interpreted as discrediting the validity of the first

---

[156] *Id.*

[157] *See e.g.*, R132 ("Our three daughters were born when Muhammad was married to Leanne Cosentino-Ahmad."), 138–39.

[158] *Singh*, 27 I. & N. at 609 ("Evidence that the parties have other romantic partners, with whom they may have children, is also a significant consideration.").

[159] *Id.* at 601 ("Such a determination requires an examination of the conduct of the parties *before and after* the marriage to ascertain their intent but 'only to the extent that it bears upon their subjective state of mind at the time they were married.'" (emphasis added)).

[160] *See* R134, 144.

[161] *See e.g.*, R299, 317, 335, 337, 415, 417.

[162] *See* R444.

marriage. A person in a non-fraudulent marriage is reasonably expected not to marry another person at the same time.

The BIA next points to two events in Leanne's October 2011 interview as support of marriage fraud. First, the BIA noted that Leanne was unable to spell Muhammad's middle name during the interview.[163] In the same sentence, the BIA also concluded that Leanne did not know the names of Muhammad's children.[164] This is not an entirely accurate characterization based on the evidence in the record. Leanne told the interviewer that two of the girls had stayed with her and Muhammad over the summer and gave their names.[165] She could not remember the name of the third girl at that moment.[166] However, less than two minutes later, Leanne remembered the third daughter's name and told the interviewer.[167] It is not correct that Leanne "did not know the names" of Muhammad's children, but it is appropriate to consider the delay in remembering one of the children's names. It is reasonable to expect that one spouse would know the names of the other spouse's children, especially when those children spend significant time with the couple, often including summers and winter holidays.[168] It must also be noted that Muhammad and Leanne gave different answers on the same day about which children had stayed with them

---

[163] R2. Leanne knew the name but indicated she could not pronounce it correctly and could not spell it. Leanne Interview at 3:00–3:30.

[164] R2.

[165] Leanne Interview at 4:57–5:53.

[166] Id.

[167] Id. at 6:33–6:36.

[168] See Muhammad Interview at 13:24–13:29 (indicating that his children come for "the full summer every summer"); id. at 24:40–24:55 (indicating that Lena gives him uninterrupted visits with the girls for the summer and winter); id. at 28:45–28:58 (stating that Leanne loves his girls like her own when they spend time with them); Leanne Interview at 4:28–4:37 (indicating the girls had stayed with them over the summer from about June to the end of August); see also R322–324 (providing for a "parenting time" arrangement between Muhammad and Lena).

during the past summer: Leanne said only two of the three had, while Muhammad said all three children had stayed with them.[169]

The BIA also noted that it was not "persuaded" by the explanation that Muhammad and Leanne were involved in an open marriage.[170] This is supported by several inconsistent statements made over the years. For example, in April 2011, Leanne signed an affidavit that from 2002 to 2007, she and Muhammad "lived together happily in a marital union."[171] In this same document she stated that she found out in 2007 about Lena, and then she (Leanne) and Muhammad had "a huge fight over the girlfriend he had in Wichita," and it turned out "they even had three children together…[she] had no idea how he had this other life."[172] This directly conflicts with the later statement that Leanne and Muhammad decided to have an open marriage in 2003, and Leanne knew about Lena coming to the United States in February 2004.[173] Muhammad's earlier 2011 affidavit also indicates that it was during an interview with immigration in 2007 that Leanne was told about Lena and their two children, not before in 2003 or 2004.[174] And in Muhammad's October 2011 interview, he stated that Leanne found out about the girls "about a year" after they were born and indicated that Leanne had talked to his sister and that is how she found out.[175] However, during Leanne's interview she told USCIS that she found out about each child a few days before each was born.[176] These are concerning and

---

[169] *Compare* Leanne Interview at 4:44–4:47, 4:55–5:02, 6:43–6:48 (indicating that only two of the girls stayed with them over the summer) *with* Muhammad Interview at 13:44–15:20 (indicating that all the girls were with him the past summer).

[170] R2.

[171] R443; *see also* Leanne Interview at 3:05–3:50.

[172] R443.

[173] *See* R152 (Leanne affirmed that she and Muhammad agreed to an open marriage. And after Muhammad went to Ukraine in January 2004, he told Leanne about "his relationship with a girl in Ukraine and that she might come to the U.S., but he was not planning to leave [Leanne] and the kids.").

[174] R446.

[175] Muhammad Interview at 37:33–37:49.

[176] Leanne Interview at 12:22–12:45.

substantial inconsistencies regarding the legitimacy of the marriage between Muhammad and Leanne.

Similarly, there are inconsistencies between what Muhammad and Leanne testified about concerning the status of their relationship. For instance, in an April 2011 affidavit, Leanne stated that when Muhammad lived in Kansas City, and during the time she was married to Tony Case,[177] she "was still seeing Muhammad roughly once sometimes twice a month."[178] She indicated that she and Muhammad "continued to have a physical relationship during this time," and she did not tell Muhammad about her relationship with Tony.[179] However, roughly six months later in the October 2011 interview with USCIS, Leanne testified that she and Muhammad were romantically separated when he moved away in 2007 to 2009.[180] Yet in Muhammad's October 2011 interview he indicated that he and Leanne were never romantically separated when they lived apart from 2007 to 2009.[181]

The events following the October 2011 interviews are also examples of inconsistencies that do not support finding a bona fide marriage between Muhammad and Leanne. For instance, in Leanne's interview she stated that she loved Muhammad very much and he was going to "be the one that stands by [her] side while [she goes] through whatever [she's] going through now."[182] She affirmed that it was their intent to stay married and living together as husband and wife.[183] On that same day, Muhammad stated that he did not marry Lena after he had three children with her because he did not love her but just wanted to make Leanne jealous by being

---

[177] R462.
[178] R444.
[179] *Id.*
[180] Leanne Interview at 7:35–8:35.
[181] Muhammad Interview at 30:17–30:36.
[182] Leanne Interview at 30:28–30:40.
[183] *Id.* at 36:42–36:46.

with Lena.[184] He also stated that it was just "a bad mistake" that he had three children with Lena (over a period of six years).[185] He stated numerous times that he loved Leanne and could not think of the hardship she would face if he was not there to support her.[186] However, only a few weeks later on November 30, 2011, Muhammad and Leanne were divorced in Kansas.[187] And a few weeks after that on January 16, 2012, Muhammad and Lena were married in Salt Lake City.[188] These are some examples of repeated inconsistent statements regarding the nature of Muhammad and Leanne's marriage. It was appropriate for BIA (and USCIS) to consider them.

In its decision, the BIA also concluded that the "long-term relationship" between Muhammad and Lena predated Muhammad's marriage to Leanne.[189] While unclear, it appears that the BIA was suggesting that Lena and Muhammad's romantic relationship predated Muhammad's marriage to Leanne. However, the court does not see record evidence supporting this finding. Lena and Muhammad met in 2000 while attending the same university. They state that they did not have a romantic relationship at that time.[190] Muhammad came to the United States in late 2001.[191] He and Leanne got married in early 2002.[192] Muhammad went to Ukraine in the summer of 2003 and early 2004, and both he and Lena have averred this was the beginning of their relationship.[193] The BIA's statement that their relationship predated Muhammad's marriage to Leanne, without further explanation, is unsupported.

---

[184] Muhammad Interview at 19:34–19:44.
[185] *Id*. at 18:03–18:09.
[186] *Id.* at 59:00–1:00:30.
[187] R222–25.
[188] R220.
[189] R2–3.
[190] R132, 141, 262.
[191] *See* R138.
[192] *See id.*
[193] *See* R132, 141, 446.

The BIA also concluded that there was not "sufficient historical evidence of a joint life" between Muhammad and Leanne.[194] As noted earlier, in their response to the NOID, Plaintiffs presented evidence attempting to rebut the Director's findings[195] and also referenced evidence that had previously been submitted.[196] While the Director considered and rejected some of this evidence, she did not state that she considered the following: (1) a 2002 federal tax return and IRS tax transcript showing Leanne and Muhammad were married, filing jointly;[197] (2) a 2003 tax return and IRS tax transcript showing Leanne and Muhammad were married, filing jointly;[198] (3) a 2002 lease agreement listing both Muhammad and Leanne;[199] (4) a 2003 lease agreement listing both Muhammad and Leanne;[200] and (5) copies of Leanne's driver's license showing she changed her name to Leanne Cosentino-Ahmad.[201]

8 C.F.R. § 204.2(a)(1)(i)(B) indicates "types of documents which may establish that" a prior marriage was not fraudulent, including, among other things: (1) "a lease showing joint tenancy of a common residence;" and (2) "documentation showing commingling of financial resources." Plaintiffs submitted some documents falling within these categories. But neither the BIA nor the Director addressed in writing that evidence. It is unclear if the BIA reviewed these documents and, if so, what weight it gave to the evidence, or how this evidence interacted with the other inconsistencies and evidence of marriage fraud. The court expresses no opinion about whether the evidence identified above warrants a change in BIA's decision. However, at least the

---

[194] R3.
[195] *See* R82 *et seq*.
[196] *See* R123–27.
[197] R124, 285, 582.
[198] R125, 579. The IRS Account Transcript shows Leanne's last name as Cosentino-Ahmad. R579.
[199] R125, 417. The lease lists "Leanne Ahmad." R417.
[200] R125, 299. The lease lists "Leanne Ahmad." R299.
[201] R156–58. The court acknowledges that the possibility that Leanne's changing of her name to Cosentino-Ahmad made be found to evidence of good faith on her part, while providing little or no evidence of the same for Muhammad.

first four items—the two tax returns and two leases—are close in time to Muhammad and Leanne's marriage. Given the close temporal relationship to the marriage, and the fact that the documents are among those highlighted by 8 C.F.R. § 204.2(a)(1)(i)(B), they are relevant to the question at hand.

Without knowing whether the BIA considered such evidence and how that evidence may have affected its decision, the court cannot reach a final determination of whether BIA's decision was arbitrary and capricious.

## **CONCLUSION**

Based on the foregoing, Plaintiffs' Motion for Review of Agency Action is granted in part and denied in part. The matter is remanded to the BIA for further proceedings consistent with this order.

Dated April 1, 2022.

BY THE COURT

David Barlow
United States District Judge